TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-03-00536-CR







Dana Pierce, Appellant



v.



The State of Texas, Appellee









FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT

NO. 02-615-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 A jury convicted Dana Lynne Pierce of murder and assessed punishment at sixty
years in prison. See Tex. Pen. Code Ann. § 19.02(b) (West 2004). Pierce does not deny
killing Shawn Rendon or challenge the sufficiency of the evidence to support her conviction, but
complains on appeal that the court erred by allowing the State to invade her attorney-client privilege
on cross-examination by asking her about the frequency of her contact with her attorney and whether
she was being "coached." She further asserts that the court erred by admitting certain evidence. 
Pierce also contends that she was denied effective assistance of counsel. We will affirm the
judgment.

BACKGROUND


 Pierce had known Rendon for eight years and lived with him for about three years. 
At the time of the events giving rise to Pierce's conviction, their relationship was deteriorating and
they were planning to move apart. Pierce blamed Rendon's mood swings and sexual desires and
practices.

 According to Pierce, Rendon forced her to have anal sex the day before she shot him. 
She testified that she had been greatly disturbed by the episode, and was further upset when he forced
her to perform oral sex on him the next morning. Pierce later worked up the courage to confront
Rendon and tell him that she wanted to seek counseling for her feelings about the anal sex. She
testified that Rendon insisted that she not talk about the matter with anyone because it would
eventually be disclosed and harm his reputation. Instead, Pierce recounted, Rendon wanted to have
sex again, this time with various sexual aids. Pierce refused and angered Rendon by repeating that
she wanted to talk to someone about the anal sex episode. Pierce said that she tried to walk away
from him, but he blocked her path, yelled at her, pushed her into a shelf, and swung her into a mirror. 
She feared he was going to force her to have sex again. Rendon then pushed her down into the
closet, causing her to break a shoe rack and knock over a shotgun. Pierce picked up the gun and
asked him to let her leave.

 Pierce testified that they struggled and that Rendon grabbed her by the hair. She
thought he was going to kill her. She recounted that, at some point, the gun fired. At this juncture,
Rendon still blocked her path and leaned toward her. Pierce initially did not remember a second
shot, but conceded that it might have happened. When Rendon fell on the floor in the adjacent
kitchen, she said she called 911.

 Peace officers responding to the scene found Rendon dead. They concluded that he
had been shot once while in the bedroom and once while in or near the adjacent kitchen. A blood-spatter expert testified that the second shot was fired while Rendon was on his knees in the kitchen,
possibly trying to use the telephone. A firearms expert testified that the first shot was fired from
three to eight feet away from Rendon, and the second shot was fired from less than six inches away. 
There was evidence of a time lag between the two shots, and evidence that one shell failed to fire
in the bedroom, supporting the State's theory that Pierce fired once, had a misfire, then fired the third
shot in the kitchen.

 Many other witnesses testified. Numerous witnesses testified that Rendon had abused
Pierce verbally, emotionally, and psychologically, and that Pierce was passive and afraid of Rendon. 
Pierce testified that she intended only to hurt Rendon, and shot him because she had no choice. 
Pierce's experts testified that she exhibited classic signs of being abused and that she did not intend
to kill Rendon, only to protect herself.

 The State called several rebuttal witnesses who challenged Pierce's description of
herself, her capacity to tell the truth, and her description of Rendon as abusive. Some also described
Pierce's debts rising into the tens of thousands, including a debt to Rendon. Evidence also showed
Pierce was served with a lawsuit on one of those debts only days before she killed Rendon.

 During the guilt-innocence phase of trial, the district court charged the jury on murder
and self-defense, as well as the offenses of sexual assault and aggravated kidnapping, from which
Pierce might have defended herself with deadly force. See Tex. Pen. Code Ann. § 9.32(a)(3)(b)
(West 2003). The jury found her guilty of murder, implicitly rejecting her claim of self-defense. At
the punishment phase, the court instructed the jury regarding sudden passion and community
supervision. The jury expressly did not find that Pierce murdered Rendon under the influence of
sudden passion. The jury assessed sentence at sixty years in prison, vitiating her request that the jury
recommend she be placed on community supervision.


DISCUSSION


 Pierce raises six issues on appeal. She complains that the court allowed the State to
invade the attorney-client privilege on cross-examination by asking her about the frequency of her
contact with her attorney and whether she had been coached. She adds that the court admitted some
evidence that improperly attacked her character for truthfulness and other evidence that concerned
the irrelevant subjects of her interest in pornography and of Williamson County's history of rarely
placing murderers on community supervision. She also complains that her counsel rendered
ineffective assistance.


Invasion of attorney-client privilege

 By her first issue, Pierce contends that the court erred by overruling her objections
to questions by the State that she contends invaded the attorney-client privilege. She complains
about a series of questions by the State that she argues implied that her attorneys coached her
testimony both before and during trial. While attempting to impeach Pierce using prior statements
inconsistent with her testimony, the State asked, "Over the past several months, Ms. Pierce, how
much time have you spent with your attorneys?" After the court overruled Pierce's objection to that
question, the State asked fourteen more questions (only one of which was objected to) about the
frequency, duration, location, and recency of Pierce's contacts with her attorney, culminating with
the State asking if Pierce and her attorney had established a means of communicating about the year
in which something occurred: "So, if people in the audience have observed that it appeared that if
the year was 2000, Ms. Davis-Jones made some sort of a circle with her hand if the year was 2001
there was some pointing that went on--." Pierce interrupted and denied being coached, saying that
she figured out the year without signals from her attorney.

 The rule establishing attorney-client privilege provides, in relevant part, that a client
may refuse to disclose and may prevent the disclosure of confidential communications made for the
purpose of facilitating the rendition of professional legal services to the client among the client, her
representatives, her lawyer, and her lawyer's representatives. See Tex. R. Evid. 503(b)(1). A client
in a criminal case also may prevent her lawyer or her lawyer's representatives from disclosing any
other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the
attorney-client relationship. See id. 503(b)(2). The purpose of the attorney-client privilege is to
promote communication between attorney and client unrestrained by fear that these confidences may
later be revealed. Austin v. State, 934 S.W.2d 672, 673 (Tex. Crim. App. 1996). Statements and
advice of the attorney are just as protected as the communications of the client. Id. But the
lawyer-client privilege is only an exclusionary rule of evidence, not a principle of constitutional
proportions. Strong v. State, 773 S.W.2d 543, 547 (Tex. Crim. App. 1989). Thus, if the trial court
erred, we may reverse only if the error affected substantial rights. See Tex. R. App. P. 44.2(b).

 In this case, no error was committed. We find no authority for the proposition that
the State cannot inquire whether, how often, how long, and how recently Pierce had met with her
attorneys. Further, in the question about hand signals, the State was asking about hand signals
purportedly observed in open court while Pierce was on the stand; it did not call for disclosure of
confidential communications. Pierce's answer, moreover, did not disclose any confidential
communications because she flatly denied that her attorney made any hand gestures, did not disclose
any underlying communications, and did not imply that she had participated in any discussions
intended to shape her testimony. We overrule her first issue.


Evidence of character for truthfulness

 By her second issue, Pierce complains that the district court erred by admitting
evidence of specific instances of conduct regarding her character for truthfulness. Although Pierce
mentions numerous instances in which the State asked Pierce about specific instances of conduct,
these form merely the background of her appellate complaint because she did not object to any
such questions posed to her. Instead, she focuses on testimony by Jody Willis, a one-time friend and
co-worker. Pierce objected when the State asked Willis, "At some point did you come to form an
opinion about the Defendant's capacity for truthfulness?" Pierce objected:


Counsel knows the proper way to impeach a person's reputation, and this is clearly
not it. All this testimony is duplicative. The Defendant has testified and now Miss
--Ms. McCown is just going over what was repeated to people. Now this is just a
way to smear her character, and we're going to hear more of it before the day is out,
I fear.


The State argued at the bench that Pierce had put her truth-telling capacity at issue. Without ruling,
the Court responded, "Well, if you'll stick to areas where this witness can contradict previous
testimony of the Defendant. As I understand it, however, reputation evidence is very formulaic and
specific instances are not permissible." The State argued that opinion evidence is permissible if a
defendant puts her truth-telling ability at issue by testifying. The court replied, "Okay. Let's stick
to those two areas." The State did not repeat its request for Willis's opinion on Pierce's capacity for
truthfulness, but prompted Willis to discuss how her friendship with Pierce dissipated as Willis came
to disbelieve some of Pierce's representations.

 We review the admission of evidence for an abuse of discretion, and can reverse only
if the court's ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. See
Montgomery v. State, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990) (op. on reh'g). A witness's
character for truthfulness cannot be impeached by specific instances of conduct other than
convictions for crimes. See Tex. R. Evid. 608(b). To preserve error, an appellant must show that
she made the complaint to the trial court by timely objection that stated the grounds for ruling with
sufficient specificity to alert the trial court to the basis of the complaint. See Tex. R. App. P.
33.1(a)(1). An appellant must also show that the trial court either ruled on the objection expressly
or implicitly or that the appellant objected to the refusal to rule. Id. 33.1(a)(2). A complaint on
appeal must comport with the trial objection or nothing is presented for review. See Rezac v. State,
782 S.W.2d 869, 870 (Tex. Crim. App. 1990); Bunton v. State, 136 S.W.3d 355, 364 (Tex.
App.--Austin 2004, pet. ref'd).

 Pierce did not complain at trial that the evidence was inadmissible under Rule 608. 
Pierce complained that the State was not impeaching her properly, but the only specific basis stated
was duplicativeness. This objection did not alert the court to her appellate complaint that the
questions improperly concern specific instances of conduct regarding her character for truthfulness. 
Further, the court did not expressly rule on the objection; the court discussed the objection and
provided guidance to the State regarding the course of questioning. Finally, the State did not
reiterate the question about Willis's opinion on Pierce's capacity for truthfulness after the objection
and discussion, and Willis did not answer it. We find no reversible error preserved on this issue.


Evidence of interest in pornography

 By her third issue, Pierce contends that the district court erred by admitting evidence
regarding her alleged interest in pornography. She complains of the admission of an e-mail from
Pierce to Rendon entitled "Yummy Pics." Attached were several pictures explicitly showing oral,
vaginal, and anal sex involving persons other than Pierce and Rendon. The e-mail was dated April
30, 2001--over a year before Pierce killed Rendon on May 15, 2002.

 Pierce contends that these photographs were irrelevant and that any relevance was
substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 401, 403. Pierce
admitted in her direct testimony that she forwarded sexually explicit pictures to Rendon via e-mail. 
She also described a sex life with him that grew more experimental, rougher, unpleasant, and
nonconsensual. She testified that she forwarded pornographic pictures to Rendon only if she
inadvertently found them in the computer after his internet explorations. She argues that the images
did not make any contested fact more or less probable. She contends that the fact that she forwarded
the photos does not mean that she looked at them, much less enjoyed them. She argues that the only
purpose was the highly prejudicial intent to portray her as sexually depraved and a liar.

 The State responds that it offered the message to counteract the impression Pierce
created during her testimony that she was an unwilling participant in various sexual acts with
Rendon. The State argues that her sending the images to Rendon shows that she was interested in
the acts depicted therein.

 In weighing the probative value of offered evidence under Rule 403, the district court
considers factors including (1) the evidence's inherent probative value; (2) its potential to impress
the jury in some irrational but indelible way; (3) the amount of time the proponent needs to develop
the evidence; and (4) the proponent's need for the evidence. Wheeler v. State, 67 S.W.3d 879, 888
(Tex. Crim. App. 2002). Even relevant evidence must be excluded when there is a clear disparity
between the degree of prejudice of the offered evidence and its probative value. Jones v. State, 944
S.W.2d 642, 653 (Tex. Crim. App. 1996). We review the court's conclusion for an abuse of
discretion. Montgomery, 810 S.W.2d at 390.

 We conclude that the district court did not abuse its discretion by finding this
evidence relevant and admissible. Pierce presented a defensive theory that she was subject to a
campaign of increasing psychological domination and sexual deviancy orchestrated by Rendon. This
theory formed the background for her contention that he raped her anally the day before the shooting,
and supported her theory of the dispute she had with Rendon and provided the basis for her fears for
her safety on the day of the shooting. Although forwarding the photos did not necessarily show
Pierce's approval of the activities depicted, the jury could infer that the e-mail undermines her
general defensive theory that she was an unwilling participant in any of the activities--particularly
when the photos are viewed in conjunction with the title of her e-mail: "Yummy Pics." We
emphasize that sending these photos does not prove acquiescence to being raped or to participation
in any of the other specific activities she says she did not consent to performing. But the district
court did not abuse its discretion by concluding that the e-mail and photos relate to Pierce's depiction
of the level of her voluntary involvement in the general course of their sexual activities and their
relationship, which also bears on her version of events on the day of the shooting--including
whether they had a dispute about these activities while she feared for her safety.

 We further conclude that the district court did not abuse its discretion by deciding that
the probative value of the evidence was not substantially outweighed by its potential unfair
prejudicial effect. Although the photographs might have been shocking or unpleasant to view for
some of the jurors, the acts depicted therein are less unusual and violent than some of the activities
in which Pierce had testified she was forced to participate; this context diminishes the likelihood that
the photos would influence the jurors in an irrational, indelible way. This evidence did not take
much time to introduce, and the State needed the evidence to counter Pierce's testimony that she was
an unwilling participant in activities like those depicted in the photos. The district court reasonably
could have concluded that the risk of unfair prejudice did not substantially outweigh the probative
value of this evidence. We conclude that the district court did not abuse its discretion by admitting
this evidence.


Evidence about community supervision in Williamson County

 By her fourth issue, Pierce contends that the court erred by admitting evidence
concerning Williamson County's history of rarely placing convicted murderers on community
supervision. At the punishment phase, Pierce called Rick Zinsmeyer, the director of the Williamson
County Community Supervision and Corrections Department, to discuss how community
supervision worked. On cross-examination, the State asked him if any murderers convicted in
Williamson County were currently on community supervision; he responded, "I don't think so, but
I didn't check. I just found out I was going to be here 20 minutes ago. But we've had some in the
past." The State then asked him to talk about particular people who had been placed on probation
for murder; after an objection, the State asked whether he recalled someone being placed on
probation for a shotgun killing. Pierce again objected to the reference to a specific case, arguing that
it was not relevant to Pierce. The court overruled the objection, and Zinsmeyer testified as follows:
"I don't know what kind of firearm was used. And the one that jumps out at me was in 1977, and
I--I feel like there's been some--I just don't recall, but I remember that because I supervised the
case. And since I don't supervise cases anymore, I just don't recall."

 The criteria for making relevancy determinations at the punishment phase differ
because the use of evidence differs. At the punishment phase, there are fewer defined elements to
be found; the court of criminal appeals wrote, "Because the material issue at punishment is so
indistinct, relevancy of proffered evidence cannot be determined by deductive processes." Sunbury
v. State, 88 S.W.3d 229, 233 (Tex. Crim. App. 2002). Accordingly, "determining what evidence
should be admitted at the punishment phase of a non-capital felony offense is a function of policy
rather than a question of logical relevance." Id. Some of the policy considerations include giving
complete information for the jury to tailor an appropriate sentence for a defendant; the policy of
optional completeness; and admitting the truth in sentencing. Id. Although the criteria the trial court
uses differ, we review the decision for an abuse of discretion. Mitchell v. State, 931 S.W.2d 950,
953 (Tex. Crim. App. 1996).

 The State contends that Pierce failed to preserve this error, arguing that the objection
overruled at trial was to a narrow question concerning a shotgun murderer getting probation, but the
complaint on appeal is to evidence on the broader issue of murderers getting probation. In context,
however, Pierce's objection was to any inquiry into other cases. She first objected to a broad
question about murderers getting probation; when the State rephrased--without the court ruling on
the objection--and asked specifically about probation based on a "shotgun killing," Pierce again
objected that "[t]his is just another way around here. This is a reference to a specific case. It's not
relevant to Dana Pierce." We find the asserted error adequately preserved for our review.

 That Zinsmeyer could recall only one other murderer who used a shotgun receiving
probation has little relevance to what sentence Pierce should receive. The testimony does not prove,
as the State contends, that the probation department could not adequately supervise a convicted
murderer; rather, it shows that the department is not often called upon to do so. But neither did the
testimony, as Pierce contends, invite the jury to speculate about how other murderers were sentenced
in Williamson County without providing any information about the other cases; it showed that
probation for murderers was rare. This evidence is at most indirect evidence of the appropriateness
of probation, which the court can admit if the evidence will not confuse the jury. See Ortiz v. State,
834 S.W.2d 343, 348 (Tex. Crim. App. 1992). But this evidence does not explain whether other
murderers who used shotguns did not get probation, whether this was appropriate, or whether or how
those cases should inform the jury regarding their decision on Pierce.

 Any error in the admission of this testimony did not harm Pierce. Because admission
of this evidence is not constitutional error, we cannot reverse unless we find that the error affected
the substantial rights of the appellant. See Tex. R. App. P. 44.2(b)(2). Substantial rights are not
affected by the erroneous admission of evidence "if the appellate court, after examining the record
as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." 
Reese v. State, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000) (quoting Johnson v. State, 967 S.W.2d
410, 417 (Tex. Crim. App. 1998)). There was ample other evidence relevant to punishment. There
were more than two weeks of evidence at the guilt-innocence phase that covered the nature of the
crime as well as Pierce's conduct and motivations. At the punishment phase, the State called
Rendon's mother to discuss the effect of the loss of her son. Pierce called two witnesses to discuss
probation and a third to talk about her friendship with Pierce. The fact that the sixty-year sentence
far exceeds the maximum ten-year length for a sentence that could be probated indicates strongly that
the jury based its sentence, and the implicit decision not to recommend community supervision, on
evidence other than Zinsmeyer's comments. We conclude that the information that community
supervision for murderers was rare in Williamson County had no effect on the sentence.


Ineffective assistance of counsel

 By her fifth and sixth issues on appeal, Pierce argues that she was denied effective
assistance of counsel in violation of both the state and federal constitutions. Pierce complains that
her counsel was unprepared to deal with the various ways in which her credibility would be attacked. 
She argues that these credibility challenges crippled her assertion of self-defense.

 The federal and state constitutions guarantee the right to the reasonably effective
assistance of counsel in a criminal proceeding. U.S. Const. amend. VI; Tex. Const. art. I, § 10. To
show ineffective assistance of counsel, a defendant must show that (1) his trial counsel's
performance was deficient, in that counsel made such serious errors he was not functioning
effectively as counsel; and (2) the deficient performance prejudiced the defense to such a degree that
the defendant was deprived of a fair trial. Strickland v. Washington, 466 U.S. 668, 689 (1984);
Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting Strickland standard for
state constitutional violations).

 A strong presumption exists that counsel rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional judgment. Strickland, 466 U.S. at
694. The strong presumption is that counsel's conduct fell within the wide range of reasonable
professional assistance. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The
challenged conduct will not constitute deficient performance unless the conduct was so outrageous
that no competent attorney would have engaged in it. Garcia v. State, 57 S.W.3d 436, 440 (Tex.
Crim. App. 2002).

 Review of a defendant's claim of ineffective assistance must be highly deferential to
trial counsel. Thompson, 9 S.W.3d at 813. We do not speculate about trial counsel's strategy. 
Blevins v. State, 18 S.W.3d 266, 271 (Tex. App.--Austin 2000, no pet.). Rather, in the absence of
direct evidence in the record of counsel's reasons for the challenged conduct, an appellate court will
assume a strategic motivation if any can be imagined. Garcia, 57 S.W.3d at 440. The defendant
must show "a reasonable probability that but for counsel's unprofessional errors, the result of the
proceedings would have been different." Thompson, 9 S.W.3d at 812. A reasonable probability is
one that undermines confidence in the outcome. Id. The record must affirmatively demonstrate the
alleged ineffectiveness and, in most cases, the trial record alone will be insufficient. Thompson, 9
S.W.3d at 813. But claims of ineffective assistance can be successful if the appellate record is
sufficiently developed. See Robinson v. State, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000).

 Pierce complains about several instances in which her counsel's performance was
deficient while she was being examined; her complaints depend on the trial record alone because
there was no hearing on the motion for new trial. She complains about the failure to object to
improper questions while the State was cross-examining her; these questions concerned her financial
status and relocation plans. She also complains that the State adduced responses from her that set
up "straw men" that the State could then impeach with prior inconsistent statements; she gives the
example of the State adducing her denial that she ever told anyone that she had a trust fund or that
her grandfather gave her $100,000, which the State then rebutted with testimony from witnesses who
said she had made those statements.

 Pierce also complains about counsel's performance while other witnesses were being
examined. She assails her counsel's failure to object to her landlord's testimony about instances in
which Pierce lied about making arrangements to pay her late rent, Willis's testimony about details
of Pierce's scheme to collect disability payments and other lies, and other witnesses' testimony about
lies Pierce told them. She also complains that her counsel failed to object to the State's failure to
lay the proper predicate for impeachment of her claims of prior sexual abuse and the State's violation
of a motion in limine regarding Pierce's arrest for theft by check. She attacks her counsel's failure
to object to the elicitation of testimony that she had temper tantrums, that she requested disability
leave because she did not like her job, and that Pierce's ex-husband was not surprised to hear that
she shot Rendon. Pierce also argues that her counsel was ineffective for eliciting testimony from a
State's witness regarding Pierce's statement that she could not receive a fair trial in Williamson
County.

 Finally, Pierce contends that her counsel was ineffective during argument at the
punishment phase for failing to remind the jury of the sudden passion instruction and for appealing
to the jury to give her probation so as not to separate her from her children. Pierce found the latter
particularly ineffective because the State then argued that invoking the children as a reason for
decision was essentially shameful and exploitative; she points to the fact that jurors wanted to meet
with prosecutors, but not the defense, after the trial as proof that her counsel's techniques alienated
the jury so much that she was deprived of the effective assistance of counsel.

 Pierce's complaints about her counsel not objecting to various evidence about her
monetary difficulties fail because that evidence was admissible to show motive under the State's
alternative theory of events. See Tex. R. App. P. 404(b). The evidence about her debts could
support a view of her motive--that Pierce was desperate to prevent Rendon from leaving because
she owed him and others so much money; indeed, evidence showed that she owed him between
$5,000 and $20,000 and was served two days before the shooting with a civil petition seeking
repayment of another debt. Thus, the evidence rebuts Pierce's self-defense claim by showing a
different motive. Pierce's counsel was not ineffective for failing to object to admissible evidence. 
See Ortiz v. State, 93 S.W.3d 79, 93-95 (Tex. Crim. App. 2002).

 Similarly, evidence rebutting her version of events surrounding her leave of absence
from work was relevant to motive. She testified that she took the leave of absence because of the
combination of effects from childhood sexual abuse and her relationship with Rendon. Evidence
that she concocted the symptoms that substantiated her obtaining the leave in order to get paid for
work and not get laid off undermine her claim that she was a psychologically battered woman who
shot Rendon in self-defense. Her counsel was not ineffective for failing to object to this admissible
evidence. See id.

 The testimony that Pierce was arrested for theft by check came in through a peace
officer's testimony about the circumstances surrounding Pierce's statement to law enforcement. The
State asked if Pierce was arrested after giving her second statement. The officer responded, "Yes,
she was. She was arrested for a theft-by-check warrant that she had outstanding." The State then
asked if the officer obtained a warrant for murder, and the officer confirmed that he did. Shortly
thereafter, Pierce's counsel asked to approach the bench and noted that the officer's testimony about
the theft-by-check charge violated a motion in limine; she stated her intention to elicit evidence that
the charge had been dismissed. On cross-examination, the officer admitted that he did not know that
the charge had been dismissed. This method of dealing with the mention of the extraneous charge
may have de-emphasized its importance to the jury. See Castoreno v. State, 932 S.W.2d 597, 603
(Tex. App.--San Antonio 1996, pet. ref'd). We do not find that Pierce's counsel was ineffective for
failing to object in the presence of the jury to the initial mention of the charge.

 Nor was Pierce's counsel ineffective for failing to object to testimony by her ex-husband. By raising a defensive theory, the defendant opens the door for the State to offer
rebuttal testimony regarding an extraneous offense if the extraneous offense has common
characteristics with the offense for which the defendant was on trial. See Bell v. State, 620 S.W.2d
116, 126 (Tex. Crim. App. 1980) (op. on reh'g). Pierce's ex-husband testified about his lack of
surprise when hearing that Pierce shot Rendon shortly before he was to leave for work. He testified
that she often started arguments shortly before he was to leave for work and that she sometimes
threw dishes at him when they argued. This tends to rebut the characterization of Pierce by other
witnesses as a quiet, undemonstrative, and passive person, and shows a different state of mind and
intent for the argument than she portrayed herself as having. Counsel was not ineffective for failing
to object to this admissible evidence. See Ortiz, 93 S.W.3d at 93-95.

 The record does not demonstrate that Pierce's counsel was ineffective for failing to
argue for a sudden-passion finding at the punishment phase. The instruction was given to the jury. 
The record does not show whether the failure to argue the issue was a lapse or an intentional
omission. Pierce's counsel focused on persuading the jury to recommend probation, noting her
compliance with pre-trial supervision. Given the jury's rejection of self-defense at guilt-innocence,
counsel may have chosen to attempt to create sympathy for Pierce in spite of her action rather than
ask the jury to "excuse" her action. The failure of that strategy does not render counsel's
performance constitutionally deficient. On this record, we cannot say that the strategy was
unreasonable. See Garcia, 57 S.W.3d at 440.

 Pierce's counsel represented her actively before and during the trial, filing motions,
questioning witnesses, and making objections. There was no evidence developed at a motion for
new trial about possible trial strategies. The acts and omissions of which Pierce complains do not
show deficient performance by her counsel on this record.


CONCLUSION



 Having resolved Pierce's issues in favor of the judgment, we affirm the conviction
and sentence.



 

 Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: August 3, 2005

Do Not Publish